IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2024

## IN RE AVYONA P.

**Appeal from the Juvenile Court for Davidson County**
**No. PT276363      Sheila Calloway, Judge**

_____

### No. M2024-00180-COA-R3-PT

_____

Appellant/Father appeals the termination of his parental rights to the minor child on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) substantial noncompliance with the permanency plan; (4) persistence of the conditions that led to the child's removal; and (6) failure to manifest an ability and willingness to assume custody. The trial court also determined that termination of Father's parental rights is in the child's best interest. Because the Department of Children's Services withdrew noncompliance with the permanency plan as a ground for termination, we reverse termination of Father's parental rights on this ground. We affirm the trial court's termination of Father's parental rights on all remaining grounds and on its finding that termination of his rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed in Part; Reversed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Inpone S.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Background

The minor child, Avyona P. (d/o/b October 2018), was born prematurely and with multiple, significant medical issues. The child's mother and father were never married, and no father was named on her birth certificate. Appellee Department of Children's Services ("DCS") became involved with Avyona in January 2020 due to allegations of medical and nutritional neglect. Although Mother and Father resided together, Mother initially identified Father as her roommate and not as her boyfriend or Avyona's father. In June 2020, the Juvenile Court for Davidson County ("trial court") issued an emergency protective order placing Avyona in DCS custody, and she has been in foster care continuously since that time.

Following a hearing on September 6, 2022, Avyona was adjudicated dependent and neglected based on stipulated findings of facts. The stipulated facts characterized Father as Mother's boyfriend, and the trial court's September 2022 order did not identify Father as Avyona's father. Accordingly, the trial court found that Mother was "the person responsible for the[] conditions" resulting in its finding of dependency and neglect. The trial court noted that Father acknowledged paternity only when he "learned that Avyona could be removed to state custody[.]" The trial court found that Avyona could not be placed in Father's care due to his criminal history and allegations of alcohol abuse, and the court enjoined Mother "from allowing any contact between Avyona and Mr. S."

Avyona remained in foster care. In January 2023, Father contacted DCS to seek visitation. Father was advised that he was required to establish paternity before visitation could be granted. On March 14, 2023, Father filed a petition to establish paternity and set visitation. Although Father completed DNA testing in March or April 2023, paternity was not established until June 2023. On June 30, 2023, the trial court entered an order setting Father's child support obligation at $25.00 per month beginning on August 1, 2023. DCS arranged for supervised therapeutic visitation beginning October 2023, and Father participated in four visits between October and December 2023.

In the meantime, on May 2, 2023, DCS filed a petition to terminate Mother's and Father's parental rights. In its petition, DCS named Father as Avyona's "alleged father." DCS asserted six grounds for termination: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) substantial noncompliance with the permanency plan; (4) persistence of the conditions that led to the child's removal; (5) failure to establish or exercise paternity; and (6) failure to manifest an ability and willingness to assume custody. The trial court appointed counsel for Mother and Father on June 20, 2023.

Mother surrendered her parental rights before DCS's petition was heard, and she is not a party to this appeal. Following hearings on October 18 and December 14, 2023, the

trial court terminated Father's parental rights on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) substantial noncompliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to assume custody. The trial court also found that termination of Father's parental rights was in Avyona's best interest. Father filed a timely notice of appeal.

## II. Issues

Father raises the following issues for review, as stated in his brief:

I. Whether the trial court erred in finding by "clear and convincing evidence" that Father abandoned the child by failing to visit, pursuant to T.C.A. § 36-1-113(g)(1) and T.C.A. § 36-1- 102(1)(a), -102(1)(c) and -102(1)(e).

II. Whether the trial court erred in finding by "clear and convincing evidence" that Father abandoned the child by failing to support, pursuant to T.C.A. § 36-1-113(g)(1) and T.C.A. § 36-1- 102(1)(a), -102(1)(b) and -102(1)(d).

III. Whether the trial court erred in finding by "clear and convincing evidence" Father's substantial noncompliance with the permanency plan responsibilities, pursuant to T.C.A. § 36-1-113(g)(2).

IV. Whether the trial court erred in finding by "clear and convincing evidence" that persistent conditions exist, pursuant to T.C.A. § 36-1-113(g)(3).

V. Whether the trial court erred in finding by "clear and convincing evidence" that Father failed to manifest an ability and willingness to assume custody, pursuant to T.C.A. § 36-1- 113(g)(14).

VI. Whether the trial court erred in finding that termination of Father's parental rights was in the best interest of the child.

## III. Standard of Review

We review the trial court's findings of fact *de novo* on the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). However, "[i]n light of the heightened burden of proof in termination proceedings ... [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* When the trial court has seen and heard witnesses, we give great deference to any findings that are

based on the court's assessment of witness credibility.  *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007).  We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it.  *Id.*  The trial court's conclusion that clear and convincing evidence supports grounds for termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524.  Whether the trial court's factual findings amount to clear and convincing evidence that termination is in the child's best interest also is a question of law that we review *de novo* with no presumption of correctness.  *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

### IV. Grounds for Termination of Parental Rights

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute.  *In re Angela E.*, 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child."  *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522-23 (footnote omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in Tennessee.  *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015).  The version of the statute in effect on the date the petition was filed—May 2, 2023—is the applicable version.  *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).  The statute provides, in relevant part:

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests

of the child.

Tenn. Code Ann. § 36-1-113(c). Accordingly, the trial court is required "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[ ]" and, if so, whether termination of the parent's rights is in the child's best interest. *In re Emarie E.*, No. E2022-01015-COA-R3-PT, 2023 WL 3619594, at *3 (Tenn. Ct. App. May 24, 2023) (quoting *In re Donna E.W.*, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014)). Although the petitioner needs to establish only one of the statutory grounds set out in section 36-1-113(g) to establish grounds, *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010), we must review the trial court's findings and conclusions as to each ground. *In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, we turn to the trial court's finding of grounds in this case.

## A. Substantial Noncompliance with the Permanency Plan

We turn first to termination of Father's parental rights on the ground of substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2). At trial, DCS withdrew noncompliance with the permanency plan as a ground for termination, and DCS states in its brief that it "does not defend this ground on appeal." Accordingly, we reverse the trial court's termination of Father's parental rights on this ground.

## B. Abandonment by Failure to Visit and Failure to Support

Under Tennessee Code Annotated section 36-1-113(g)(1), abandonment, as defined by section 36-1-102, is a ground for termination of parental rights. The version of section 36-1-102(1)(A)(i) in effect when DCS filed its petition to terminate Father's parental rights defines abandonment, in relevant part, as follows:

(I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Section 36-1-102(1)(D) defines failure to support as follows:

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure,

for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]

Section 36-1-102(1)I defines failure to visit as follows:

I For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]

The statute also provides:

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I).

Avyona entered DCS custody on June 1, 2020, and Father made no attempt to contact DCS to inquire about visitation until January 2023. DCS filed its petition to terminate Father's parental rights on May 2, 2023. Therefore, the period relevant to our review is January 2, 2023, to May 1, 2023. In his brief, Father argues that he began to reach out to DCS in January 2023 to seek visitation, but DCS would not permit visitation until Father established paternity by DNA testing. He also argues that he was not informed that DNA testing was required until he filed a petition for visitation in March 2023 and submits that the results of the DNA testing "were not made know" until June 2023. Father contends that another four months elapsed before DCS arranged visitation.[2] He also submits that, prior to 2023, he did not establish paternity because he "knew he was the father" and did not seek visitation "because of an order of protection that was in place that would have led to him being arrested if he were to be around Mother and Avyona." In short, Father does not dispute that he did not visit Avyona for more than two years but argues that his failure to visit during the relevant four-month period was not willful.

---

[2] It is undisputed that after visitation was established, Father visited Avyona three times from October through December 2023.

Similarly, Father does not dispute that he made no child support payments before August 2023. In his brief, Father argues that DCS failed to prove abandonment by failure to support because it did not offer proof of Father's income or expenses during the relevant period. However, Father testified that he was employed during the relevant period and earned $500-$600 per week. Father testified that he was not asked to pay child support and argues that he did not pay support before August 2023 because he "had no idea ... where to send the payments []." Despite Father's arguments, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]" Tenn. Code Ann. § 36-1-102(1)(H). Additionally, from our review, Father made no effort to contact DCS or to take any affirmative action to pay child support.

Nonetheless, as noted above, the absence of willfulness is an affirmative defense to the ground of abandonment which must be asserted pursuant to Tennessee Rule of Civil Procedure 8.03. Tenn. Code Ann. § 36-1-102(1)(I). The defense is waived if it is not affirmatively asserted. *In re Neveah W.*, M2023-00944-COA-R3-PT, 2024 WL 1792775, at *11 (Tenn. Ct. App. April 25, 2024). Here, Father did not raise the lack of willfulness as a defense. Therefore, it is waived and cannot be raised for the first time on appeal. *See id.* We affirm the trial court's termination of Father's parental rights on the ground of abandonment by failure to visit and failure to support.

## C. Persistence of Conditions

Under Tennessee Code Annotated section 36-1-113(g)(3), parental rights may be terminated on the ground that:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly

- 7 -

diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

In his brief, Father argues that the trial court erred in terminating his parental rights on this ground because only Mother was found to be responsible for the conditions that led to Avyona's removal to DCS custody. However, as noted above, Father was not identified as Avyona's father in the trial court's September 2022 order; he was identified only as Mother's boyfriend—*i.e.*, not a person responsible for Avyona—in the stipulated facts. Additionally, the trial court specifically found that Father—identified as "Mr. S."—was not an appropriate person to assume custody of Avyona. The trial court found Avyona to be dependent and neglected while she was in both parents' care, and we find Father's argument to be unpersuasive.

Avyona entered DCS custody due to medical/nutritional neglect and substance abuse by her parents. It is undisputed that Anyona is an extremely medically fragile child. She cannot eat solid food and has an autism spectrum disorder. As the trial court found:

> [The] child was born premature and had significant medical issues. The child was in the NICU for approximately two months after birth. The child continues to have significant medical issues which require her to have around the clock care. Her issues include using a G-Tube for food, having a hole in her heart, a cleft pallet, and sight issues. The child currently is in both occupational therapy and physical therapy. She sees about six separate specialists.

Although Father completed parenting, mental health, and alcohol and drug assessments in September 2023, he made no effort to comply with any of the assessment recommendations. In its final order, the trial court stated:

> Most concerning to the court are the concerns of the medical and nutritional needs of the child. Father seems to minimize the complexities of all the child's medical needs. He has not actively participated in any of her medical or therapy appointments. At one visit, Father brought food for the child to eat knowing that she can only receive food through her G-Tube. It is clear the concerns of medical and nutritional neglect that occurred at the time of the removal would still exist[] now if the child was in the care of Father.

The trial court found that: (1) it was unlikely Avyona could be returned to Father's care in the near future; (2) Avyona was integrated into a safe, stable, pre-adoptive foster home; and (3) the continuation of the parent/child relationship diminished her chance of early integration into a stable, permanent home. The record supports the trial court's findings.

Father's testimony was disjointed and often contradictory. Father alternately testified that he lived with his parents and that he lived separately, and it is unclear whether Avyona would live with Father or "Grandma" if returned to Father's custody. He further testified that he caught "king rat[s]" in his home but had not scheduled a pest control service until "like, next week." Father also testified that he works ten hours a day and would rely on his mother to care for Avyona. He repeatedly testified that "Grandma's" best friend was a dog named Moochie. Father did not know what grade Avyona was in at school or preschool. He did not know whether Avyona was able to use the toilet, and he was unaware of some of her medical conditions and needs. In fact, despite her medical conditions, at one visit, Father attempted to feed pizza to the child. When asked whether he had other children, Father replied that he had pets. When asked whether he had raised a child, Father replied:

> Have I ever raised a child? Like, it's kind of hard question. But, yeah, I've got parents. They raised me. You know, like if I say I raised my parents, would that be right? I still have my parents. Like, it's going to be my first time –

With respect to the trial, Father testified:

> You know, like it's a waste of time. Like, you know, I don't need to be here. If I'm wrong, I'm wrong, and you all go ahead and shoot me.

We agree with the trial court that clear and convincing evidence exists to show that the circumstances that led to Avyona's removal from her parents' care—their inability to provide for her substantial medical and nutritional needs—persist and are unlikely to be remedied in the near future. We also agree that returning Avyona to Father's care would expose her to further medical neglect. We affirm on this ground.

### D. Failure to Manifest a Willingness or Ability to Assume Custody

We turn next to review the trial court's termination of Father's parental rights on the ground of failure to manifest an ability and willingness to assume custody or financial responsibility for the child under Tennessee Code Annotated section 36-1-113(g)(14). Under this section, parental rights may be terminated if "[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

From our review, there is clear and convincing evidence to support the trial court's conclusion that Father has failed to manifest an ability to assume custody of Avyona, and that placing Avyona in his custody would pose a risk of substantial harm to her welfare.

As discussed above, Father's testimony reveals that he fails to appreciate the severity of Avyona's medical needs and that he is unable to meet those needs. The totality of the circumstances provides clear and convincing evidence that Father has failed to manifest an ability to assume custody of the child.

## V. Best Interest

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. These factors include:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of

circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

 (N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

Tenn. Code Ann. §§ 36-1-113(i)(1)(A)-(T), 36-1-113(i)(2).

The court must consider "all relevant and child-centered factors applicable to the particular case[.]" Tenn. Code Ann. §§ 36-1-113(i)(1). Whether termination of parental rights is in a child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]'" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

This Court has noted that many of the statutory factors are predicated on the same facts and involve similar issues and considerations. *In re Kurt R.*, No. E2023-01108-COA-R3-PT, 2024 WL 4040828, at *13 (Tenn. Ct. App. Sept. 4, 2024) (citation omitted). Accordingly, we have grouped our discussion of the child's best interest "'based on the overarching themes within the list of twenty factors[.]'" *Id.* (quoting *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023)). These themes broadly encompass the child's emotional needs, the child's physical environment and well-being, and the parent's efforts and ability to meet those needs. *Id.* at 14 (citing Tenn. Code Ann. § 36-1-113(i)(1)). Additionally, some factors may weigh more heavily than others under the circumstances, and the trial court "may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *In re Neveah M.*, 614 S.W.3d at 679 (quotation omitted).

As stated above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d 105, 112-113 (Tenn. 2013). We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether those factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

In its January 2024 order, the trial court made the following findings concerning the child's best interest:

**(1) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority.**

The child currently receives care that was not provided before she came into DCS custody. She has been in the same foster home since June of 2020 and has built strong relationships with her foster family. This foster home is pre-adoptive and the foster parents are willing to provide the continuity and stability the child needs.

**(2) The effect and change of caretakers and physical environment are likely to have on the child's emotional, physical, and mental condition.**

The child has been in foster care for over three years now. She has spent a significant part of her life with the [foster] family where she has overcome many issues. The [foster] family has provided the services needed for her emotional, physical, and mental wellbeing. Therefore, a change in caretakers and physical environment would be detrimental to her emotional, physical, and mental condition.

**(3) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs.**

In this case, Father has not demonstrated continuity or stability. Father has not cooperated with DCS and has not given them proof of stable housing or stable income. Father has not been able to demonstrate his ability to provide for the medical care the child needs. Father has not shown the ability to take care of his own needs, better yet the child's needs.

**(4) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such an attachment.**

Father has only started seeing the child in October of 2023. He had not seen his child for almost the entire time she has been in foster care. Father has only supported his child by token payments in the last couple of months. Therefore, there is no attachment between Father and his child.

**(5) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.**

As stated before, Father has only recently seen child in the last couple of months. Therefore, a positive relationship with his child is unlikely.

**(6) Whether the child has created a healthy parental attachment with another person or persons in the absence of the Parent.**

The child has been with the [foster] family since she was almost two years old. She is currently five years old now. They have created a bond with the child and have provided for all her needs.

**(7) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for**

**the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner.**

According to the Father's mental health assessment, there are many concerns about Father's mental health. Father has not done anything to follow up on the assessment. Father's behavior during his visits with the child, as well as his testimony in court, display some of the concerning behaviors. Father has shown an inability to create a stable environment for his child.

**(8) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstances, conduct, or conditions that made an award of custody unsafe and not in the child's best interest.**

Father has not demonstrated a sense of urgency in addressing the circumstances which caused the child to be placed in DCS custody. The child has been in foster care for over three (3) years. Father has not addressed the medical and nutritional needs of the child. He has not attended any of her medical or therapy appointments. Further he has not learned how to provide for her needs appropriately. Father has not rendered the conditions that would make an award of custody safe for the child.

**(9) Whether the parent has ever provided safe and stable care for the child or any other child.**

Father has not been able to provide for a safe and stable environment for his child. Furthermore, Father has not provided any proof to DCS as to his housing or income. He is currently not able to provide a safe and stable environment for his child.

**(10) Whether the parent has demonstrated the commitment to creating and maintaining a home that meets the child's basic and specific needs in which the child can thrive.**

Father has not been responsive to DCS to show that he is committed to maintaining a home for the child to thrive. Father has not shown proof of stable housing. Father testified that he was living with his parents. He also admitted that his father has had problems with alcoholism in the past. Therefore, he has not demonstrated a commitment to creating and maintaining a home meeting the needs of the child.

From our review, the foregoing findings are supported by clear and convincing evidence. As noted above, Avyona has considerable medical needs and an autism spectrum disorder. For many of the reasons previously discussed, clear and convincing evidence supports the trial court's determination that Father is unable to meet Avyona's physical, medical, and emotional needs.

The record shows that, through counseling and therapy, Avyona has improved significantly while in foster care with a pre-adoptive family that is able to meet her needs. Conversely, there is no bond between Father and the child. Father has not demonstrated an ability to care for her, and he has made no effort to avail himself of opportunities to seek mental healthcare for himself as recommended following his mental health assessment. We agree with the trial court that termination of Father's parental rights will further the child's "critical need for stability" and provide for her physical and emotional needs. We affirm the trial court's conclusion that termination of Father's parental rights is in the child's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Father's parental rights on the ground of substantial noncompliance with the permanency plan. We affirm the trial court's termination of Father's parental rights on the remaining grounds, and on its finding that termination of Father's parental rights is in the child's best interest. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed to the Appellant, Inpone S. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE